Slip Op. 19-122

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD., SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD., JIANGSU HUAFENG ALUMINUM INDUSTRY CO., LTD., and JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD,** | **Before: Jane A. Restani, Judge** |
| Plaintiffs, | **Court No. 18-00089** |
| v. | |
| **UNITED STATES,** | |
| Defendant, | |
| **ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, JW ALUMINUM COMPANY, NOVELIS CORPORATION, and REYNOLDS CONSUMER PRODUCTS LLC,** | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

Dated: September 18, 2019

[Commerce's final affirmative countervailing duty determination with respect to certain aluminum foil from the People's Republic of China is partially sustained and partially remanded for reconsideration consistent with this opinion.]

Jeffrey S. Grimson, Mowry & Grimson, PLLC, of Washington, D.C., for Plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminum Industry Co., Ltd., and Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.  With him on the briefs were Jill A. Cramer, Sara M. Wyss, Yuzhe PengLing, James C. Beaty, and Bryan P. Cenko.

Aimee Lee, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for the defendant.  With her on the brief were Joseph

H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.  Of counsel on the brief was Mercedes Morno, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

John M. Herrmann, II and Grace W. Kim, Kelley Drye & Warren, LLP, of Washington, D.C., for Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its Individual Members, JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC.

Restani, Judge: In this action challenging a final determination and countervailing duty order issued by the United States Department of Commerce ("Commerce") regarding certain aluminum foil from the People's Republic of China ("PRC"), covering the period from January 1, 2016, through December 31, 2016, Jiangsu Zhongji Lamination Materials Co., Ltd. ("Zhongji"), and its affiliated companies, Shantou Wanshun Package Material Stock Co., Ltd. ("Shantou Wanshun"), Jiangsu Huafeng Aluminum Industry Co., Ltd. ("Jiangsu Huafeng"), and Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. ("Zhongji HK"), request that the court hold Commerce's countervailing duty determination to be unsupported by substantial evidence or otherwise not in accordance with law.

## BACKGROUND

Following a petition filed by the Aluminum Association Trade Enforcement Working Group and its individual members, JW Aluminum Company, Novelis Corporation, Reynolds Consumer Products LLC (collectively "Petitioners" or "Defendant-Intervenors"), Commerce initiated a countervailing duty ("CVD") investigation into various subsidy programs concerning imports of certain aluminum foil from the PRC.  See Certain Aluminum Foil from the People's Republic of China: Initiation of Countervailing Duty Investigation, 82 Fed. Reg. 15,688 (Dep't Commerce Mar. 30, 2017).  Commerce selected Zhongji as a mandatory respondent and issued questionnaires to Zhongji and the Government of the PRC ("GOC").  See Certain Aluminum

Foil from the People's Republic of China: Preliminary Affirmative Countervailing Duty

Determination, 82 Fed. Reg. 37,844 (Dep't Commerce Aug. 14, 2017) ("Prelim. Determination")

and accompanying Decision Memorandum for the Preliminary Determination in the

Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of

China, C-570-054, POI 1/1/2016-12/31/2016 at 9–10 (Dep't Commerce Aug. 7, 2017) ("Prelim.

I&D Memo"). Commerce sought, inter alia, supporting sales documentation for Zhongji's

requested export value adjustment.[1]  See Prelim. I&D Memo at 9–10. Zhongji, responding on

behalf of itself and all affiliated companies, reported that, during the period of investigation, all

of its sales to the United States were made through Zhongji HK, a Hong Kong-incorporated

company wholly owned by Zhongji.  See Prelim. I&D Memo at 10; see also Preliminary

Determination Calculation Memorandum for Zhongji Lamination Materials Co., Ltd at 3, P.R.[2]

293 (Dep't Commerce Aug. 7, 2017) ("Prelim. Calc. Memo") (examining "Zhongji HK together

with Zhongji as a cross-owned, affiliated trading company" pursuant to 19 C.F.R. §

351.525(c)).[3] Zhongji also submitted supporting documentation for its requested export value

---

[1] Although Commerce uses the term "export value adjustment," it has also referred to this
adjustment as an "entered value adjustment."  See Decision Memorandum for the Final Results
of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Cells, Whether
or Not Assembled into Modules, from the People's Republic of China: 2015 at 47 n.258, C-570-
980, POI 01/01/2015–12/31/2015 (Dep't Commerce July 12, 2018) ("CSP Cells from the PRC").

[2] "P.R." refers to a document contained in the public administrative record. "C.R." refers to a
document contained in the confidential administrative record.

[3] 19 C.F.R. § 351.525(c) states that "[b]enefits from subsidies provided to a trading company
which exports subject merchandise shall be cumulated with benefits from subsidies provided to
the firm which is producing subject merchandise that is sold through the trading company,
regardless of whether the trading company and the producing firm are affiliated."  Accordingly,
benefits attributed to Zhongji and to Zhongji HK are cumulated. See Prelim. Calc. Memo at 3.

adjustment.  See Zhongji Initial Questionnaire Response at Vol. IV, Ex. 6, P. R. 126-30, C.R.

58–80 (June 12, 2017); Zhongji Second Supplemental Section III Questionnaire Response, C.R.

136, P.R. 212 (July 14, 2017).

       In its preliminary determination, Commerce granted Zhongji's requested export value

adjustment, adjusting the subsidy rate to account for the mark-up between the export value from

the PRC and the value of subject merchandise produced by Zhongji as entered into the United

States.  See Prelim I&D Memo at 10–11.  Commerce used Maersk Shipping Line ("Maersk")

price quotes to calculate the benchmark to value ocean freight expenses, excluding Zhongji's

proffered freight rates from Xeneta, a freight rate market intelligence firm.  See id. at 17–18.

Commerce, however, concluded that the GOC withheld information that was requested of it and

failed to cooperate to the best of its ability with respect to certain information regarding the

Export Buyer's Credit Program ("EBCP"), the provision of electricity at less than adequate

remuneration ("LTAR"), and "Other Subsidies" self-reported by Zhongji.  See id. at 26–29, 37–

42.  Accordingly, pursuant to 19 U.S.C. §1677e(a)–(b), Commerce relied on facts otherwise

available and drew adverse inferences to find these programs countervailable.  Id. at 45, 52–54.

Commerce also countervailed "policy" loans received from PRC state-owned commercial banks

("SOCBs") that were outstanding during the period of review ("POI").  Id. at 42–44.  Between

October 16, 2017 and October 20, 2017, Commerce verified questionnaire responses submitted

by Zhongji pursuant to 19 U.S.C. § 1677m(i).  See Verification Report for Zhongji Lamination

Materials Co., Ltd, C.R. 285, P.R. 350 (Dep't Commerce Dec. 5, 2017).

       After receiving submissions from interested parties, Commerce issued its final

determination and assigned Zhongji a 17.14 percent subsidy rate.  See Countervailing Duty

Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative

Determination, 83 Fed. Reg. 9,274, 9,275 (Dep't Commerce Mar. 5, 2018) ("Final

Determination"), amended by Certain Aluminum Foil from the People's Republic of China:

Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,

83 Fed. Reg. 17,360 (Dep't Commerce Apr. 19, 2018) ("Amended Final Determination");[4] see

also Decision Memorandum for the Final Determination in the Countervailing Duty

Investigation of Certain Aluminum Foil from the People's Republic of China, C-570-054, POR

1/1/2016-12/31/2016 (Dep't Commerce Feb. 26, 2018) ("I&D Memo").  In accordance with its

verification findings, Commerce denied Zhongji's export value adjustment request.  I&D Memo

at 42–45.  Commerce continued to use an adverse inference from facts otherwise available

("AFA") to countervail subsidies received with respect to the EBCP, the provision of electricity

at LTAR, and Zhongji's "Other Subsidies," and continued to find that the SOCB loans were

countervailable.  I&D Memo at 14–16, 20–23, 29–35, 62–65.  Finally, Commerce further relied

solely on the Maersk data for the freight benchmark.  I&D Memo at 65–66.  Zhongji challenges

these determinations.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(i).  Commerce's countervailing duty determinations are upheld unless

"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).

---

[4] The Final Determination was amended in order to correct ministerial errors.  See Amended
Final Determination, 83 Fed. Reg. at 17,360.  The Amended Final Determination did not affect
Zhongji's subsidy rate.  Id. at 17,361.

## DISCUSSION

### I.    Export Value Adjustment

Commerce must impose countervailing duties equal to the amount of the net

countervailable subsidy.  19 U.S.C. § 1671(a).  Countervailing duties are imposed through the

calculation of individual countervailable subsidy rates for each investigated exporter and

producer.  See 19 U.S.C. §§ 1671d(c)(1)(B)(i)(I), 1671b(d)(1)(A)(i), 1675(a).  The subsidy rate

is calculated by "dividing the amount of the benefit allocated to the period of investigation or

review by the sales value during the same period of the products to which [Commerce] attributes

the subsidy."[5]  19 C.F.R. § 351.525(a).  If the product is exported, the sales value will normally

be determined on a free on board ("F.O.B.") (port) basis.  Id.  Assuming, the F.O.B. export price

of the merchandise leaving the foreign country and the import value of the merchandise entering

the United States are identical, the collection of duties, based on the import value,[6] is equal to the

net countervailable subsidy, based on the F.O.B. export price. See Ball Bearings and Parts

Thereof from Thailand; Final Results of Countervailing Duty Administrative Review, 57 Fed.

Reg. 26,646, 26,6647 (Dep't Commerce June 15, 1992) ("Ball Bearings from Thailand"). In

other circumstances, however, merchandise leaves a foreign country at an F.O.B. price that is

lower than the value at which the merchandise enters the United States. Id. The higher entered

value can result when a parent company sells merchandise in a back-to-back intercompany sales

---

[5] The benefit received is referred to as the "numerator" and the sales value referred to as the "denominator" of the subsidy rate.

[6] The import value, or customs value, to which countervailing duties would be applied is established by the invoice that accompanies Customs Form 7501.

transaction to a foreign affiliate, which then sells the merchandise to the United States with a

mark-up.  Id.  Commerce first explained this scenario in <u>Ball Bearings from Thailand</u>:

> [I]n this case, there are two F.O.B. export prices for the same sale: the one on
> which subsidies are applied for and received by [the parent company], and the one
> which includes [the affiliate's] mark-up and which is the value listed on the
> [parent company's] invoice accompanying the merchandise to the United States.
> At verification, [the parent company] demonstrated that their accounting systems
> are set up to track the mark-up for each individual shipment of bearings via back-
> to-back invoices that are identical except for price.  When [the parent company]
> ha[s] a shipment ready for export, [it] will electronically transmit a copy of the
> invoice to [its affiliate], who then adds the mark-up amount and transmits the
> invoice back to Thailand.  This marked-up invoice is then cut in Thailand and
> packed with the shipment for export from Thailand.  Even though [the affiliate]
> determines the mark-up, the merchandise is shipped from Thailand to the United
> States accompanied by the marked-up invoice.

<u>Id.</u>  When entering the United States, therefore, the mark-up creates a mismatch between the

previously calculated subsidy rate and the final invoiced price to which the subsidy rate is

applied, resulting in a potential over-collection of duties.  The mark-up thus skews the subsidies

attributed to the merchandise by an amount equal to the percentage of the mark-up.  In <u>Ball</u>

<u>Bearings from Thailand</u>, because the two invoices had a "one-to-one correlation" and because

the merchandise was "shipped directly from Thailand to the United States and [was] not

transshipped, combined with other merchandise, or repackaged with other merchandise,"

Commerce was able to adjust the subsidy rate to reflect the amount of subsidies actually

bestowed.  <u>Id.</u>  To adjust the rate, Commerce first divided the F.O.B. value of the exports of the

subject merchandise before the mark-up by the value of the same merchandise after the mark-up,

as entered into the United States, which reflected the difference in the export and import values.

<u>Id.</u>  Commerce then multiplied the resulting ratio by the subsidy rate to obtain an <u>ad valorem</u>

subsidy rate for each countervailable program.  <u>Id.</u>; <u>see also</u> <u>Issues and Decision Memorandum</u>

Court No. 18-00089                                                        Page 8

for the Final Determination in the Countervailing Duty Investigation of Coated Free Sheet from

the People's Republic of China at Comment 21, C-570-907, POI 1/1/2006–12/31/2006 (Dep't

Commerce Oct. 25, 2007) ("CFS from the PRC") (outlining the same calculation to obtain the

subsidy rate where a company was eligible for the export value adjustment).

      In subsequent investigations, Commerce stated that it has established a practice of

adjusting the calculation of the subsidy rate "when the sales value used to calculate that subsidy

does not match the entered value of the merchandise, e.g., where subject merchandise is exported

to the United States with a mark-up from an affiliated company." Countervailing Duty

Investigation of Certain Uncoated Paper from Indonesia: Issues and Decision Memorandum for

the Final Affirmative Determination at 12, C-560-829, POI 1/1/2014–12/31/2014 (Dep't

Commerce Jan. 8, 2016).  Based on the determination in Ball Bearings from Thailand,

Commerce's existing practice grants an export value adjustment where the respondent's sales to

the United States meet the following six criteria:

> 1) the price on which the alleged subsidy is based differs from the U.S. invoiced
> price, 2) the exporters and the party that invoices the customer are affiliated, 3)
> the U.S. invoice establishes the customs value to which the CVD duties are
> applied, 4) there is a one-to-one correlation between the invoice that reflects the
> price on which subsidies are received and the invoice with the mark-up that
> accompanies the shipment, 5) the merchandise is shipped directly to the United
> States, and 6) the invoices can be tracked as back-to-back invoices that are
> identical except for price.

See CFS from the PRC at Comment 21.  According to Commerce, the six criteria listed above

must be met to ensure that "the sales value adjustment properly reflects an upward adjustment to

the sales value of all merchandise that entered the United States, and on which [Customs]

assessed dutiable value." CSP Cells from the PRC at 47–48.

      Here, based on information provided by Zhongji, Commerce preliminary determined that

Zhongji met all six criteria and made an export value adjustment to the entered value of

Zhongji's sales made through Zhongji HK, the Hong Kong-incorporated affiliated company,

based on information provided by Zhongji.  Prelim I&D Memo at 11.  To determine the sales

value, Commerce included all sales by Zhongji HK, i.e. the higher valued sales, instead of all

sales by Zhongji to Zhongji HK, i.e. the lower valued sales.  Id.; Prelim. Calc. Memo at 4.  As a

result, the denominator was larger because it included the mark-up reflected in the invoices that

accompany shipments to the United States.[7]  The result is a lower CVD percentage rate.

    But Commerce's subsequent verification appeared to call into question Zhongji's ability

to meet all six criteria; in particular, the requirement that Zhongji HK ship the subject

merchandise directly to the United States.  I&D Memo at 44.  At verification, Commerce

discovered that "Zhongji's export sales ledger contained all exports and was not sub-divided by

country or region."  Verification Report at 11.  Zhongji identified companies they considered to

be U.S. customers for each sale in the ledger.[8]  See Verification Report at 11; see also Pre-

Verification Minor Corrections by Jiangsu Zhongji Lamination Materials Co., Ltd. at 8, P.R. 331

(Oct. 23, 2017) ("the segregation of US and non-US sales are based on manual identification,

transaction-by-transaction.").  Verification revealed that some companies characterized as U.S.

---

[7] This calculation is different from the one in Ball Bearings from Thailand.  There, in its final determination, Commerce adjusted the subsidy rate calculated in the preliminary determination, which did not account for an export value adjustment, and multiplied that rate by the mark-up ratio.  57 Fed. Reg. at 26,647.  Here, by contrast, in the preliminary determination, Commerce adjusted the sales value (i.e., the denominator) in calculating a subsidy rate that is reflective of an export value adjustment.  Apparently, it is not administratively feasible for Customs to simply lower the entered value to a pre-markup level.

[8] Zhongji then manually summed the value of sales to U.S. customers to determine the total value of U.S. sales during the period of investigation.  Verification Report at 11.

customers were trading companies.  <u>Verification Report</u> at 12.  One of those trading companies

withheld the identity of its final customers and another stated that its customers were located in

the United States and also in a foreign country.  <u>Id.</u>  Commerce also examined five sale

documentation packages that Zhongji characterized as sales to U.S. customers.  <u>Id.</u> at 2.  The

examination revealed that some of the sales involved merchandise shipped directly to the United

States, one sale was shipped directly to a foreign country, i.e., it never made entry into the United

States, and another sale was shipped to a customer in a foreign country through a trading

company characterized as a U.S. customer, who changed the commercial invoice before sending

it to the final customer.  <u>Id.</u> at 2, 12.

Commerce concluded in its final determination that Zhongji's identification of U.S. sales

was faulty because Commerce discovered that some merchandise did not enter the United States

or was shipped via trading companies outside of the United States.  <u>I&D Memo</u> at 44.  Thus,

Commerce found, "Zhongji was unable to identify its U.S. sales with certainty, [and could] no

longer claim that all of its sales of subject merchandise to the U.S. meet the six criteria."  <u>Id.</u>

Moreover, Commerce was concerned that, because the unaffiliated trading companies are able to

change the invoice before sending it to the final customer, it could no longer verify a one-to-one

correlation between "the invoice that reflects the price on which subsidies are received (i.e., the

invoice from Zhongji) and the invoice that accompanies the shipment."  <u>Id.</u>  Commerce

concluded that Zhongji could not show that an export value adjustment would properly reflect an

upward adjustment to the sales value of all merchandise that entered the United States.  <u>Id.</u> at 44–

45.  Accordingly, Commerce's final determination did not adjust the sales value for sales through

Zhongji HK.  <u>Id.</u> at 45.

Zhongji challenges Commerce's reasons for denying the adjustment originally granted and argues that that there was no regulatory or reasonable basis for distinguishing between exports to U.S. and non-U.S. customers.  Zhongji Br. at 9, 15–16.  Zhongji claims that the existence of non-U.S. sales, its inability to identify U.S. sales with certainty, or its use of U.S. trading companies does not disqualify it from an export value adjustment ("EVA") under Commerce's past practice and statutory obligation.  Id. at 9, 14.  Zhongji emphasizes that there were no inconsistencies regarding any shipment's compliance with the six criteria regardless of the ultimate destination, and that the focus of the inquiry should be on whether sales that did enter the United States were subject to the mark-up.  Id. at 13, 14.  Moreover, Zhongji argues, because the regulations rely on total sales or total export sales as the denominator, and do not limit the CVD calculation denominator to U.S. sales, this distinction for purposes of calculating an EVA is irrelevant.  Id. at 9–10, 15–16.

In response, the government argues that Commerce correctly determined that Zhongji's sales through Zhongji HK failed to meet the requisite criteria, that Commerce's denial of an EVA is consistent with prior practice, that its requirement that Zhongji identify U.S. sales is supported by regulation, and that Commerce did not improperly rely on intracompany sales.  Gov't Br. at 11–22.  The government points out that Zhongji's methodology was faulty, and could not identify its U.S. sales with certainty, even though Commerce requested sales "ledgers to cross-check Zhongji's list of U.S. customers."  Id. at 14, 16 (citations omitted).  It claims that Commerce was unable to verify whether sales made by the affiliate through the unaffiliated trading company were shipped directly to the United States because of Zhongji's use of trading companies and that there was no "one-to-one correlation" between the invoices because an

unaffiliated trading company could change the commercial invoice before sending it to the final

customer.  Id. at 15.

Defendant-Intervenors emphasize that Commerce could not verify "that all of Zhongji

HK's reported shipments of subject merchandise were provided directly to U.S. customers, with

a one-to-one correlation between Zhongji's invoice and the final U.S. customer."  Def.-Ints. Br.

at 10.  They add that Zhongji "did not know the destination of any merchandise shipped to this

customer, nor did it know whether such sales were actually U.S. sales."  Id. at 11.  Accordingly,

they argue, Commerce could not use the information initially reported as the basis for making an

EVA determination.  Id. at 13.  Defendant-Intervenors point out that the regulation addresses

subsidies tied to particular markets to counter Zhongji's claim that the regulation does not limit

the CVD calculation denominator to U.S. sales.  Def.-Ints. Br. at 13–14 (citing 19 C.F.R. §

351.525(b)(4) ("[I]f a subsidy is tied to sales to a particular market, [Commerce] will attribute

the subsidy only to products sold by the firm to that market.")).  Central to Commerce's EVA

analysis, they claim, is the "location of the ultimate customer, as well as Zhongji's lack of

knowledge of the customer's location."  Id. at 14.

In reply, Zhongji argues that an EVA is not conditioned on the United States being the

only export destination and that the calculation relies on total sales and total export sales without

distinguishing between U.S. and non-U.S. sales.  Plaintiffs Reply Brief in Support of Rule 56.2

Motion for Judgment on the Agency Record at 2, ECF. No. 38 (June 7, 2019) ("Reply Br.").

Zhongji contends that the examined set of shipments that were not "U.S. sales entering the

United States" are immaterial, and that an unaffiliated trading company's ability to change the

commercial invoice prior to the final sale does not bear on whether Zhongji HK's invoices bore a

one-to-one correlation with Zhongji's initial invoice.  Reply Br. at 2–4.

  Commerce's reasoning is lacking in several critical aspects.  Commerce does not

adequately explain why, given the calculation methodology employed in this case, the

identification of U.S. sales or U.S. customers is relevant to the EVA determination or,

specifically, to the criterion that merchandise be shipped directly to the United States.  Over-

collection of duties occurs when Customs imposes a duty based on a subsidy rate that did not

account for a mark-up reflected on the invoice used by Customs to calculate the duty owed.

What matters, then, is the point at which Customs assesses a countervailing duty and the

accuracy of the sales value, reflected on the relevant entry forms, on which Customs computes

that duty.  See, e.g., CSP Cells from the PRC at 47–48 ("[The EVA] properly reflects an upward

adjustment to the sales value . . . on which [Customs] assessed dutiable value.").  The record

indicates that all of Zhongji's shipments that enter the United States are processed through

Zhongji HK and that Zhongji HK marks-up all of its invoices.  See Prelim I&D Memo at 10–11;

Prelim Calc. Memo at 3.  If so, all invoices that make entry into the United States include the

mark-up.  Moreover, Commerce does not claim that Zhongji's merchandise shipped to the

United States undergoes transshipment, combinations, or repackaging, the concerns addressed in

Ball Bearings from Thailand, such that the entered value would be altered for reasons other than

the mark-up or that the Hong Kong mark-up does not really exist.  See 57 Fed. Reg. at 26,647.

  Specifically, Commerce does not explain why it could no longer subtract all sales to

Zhongji HK and then add sales by Zhongji HK to adequately account for the upward adjustment

to the sales value as it enters the United States, even after discovering that some sales were to

foreign markets, U.S. trading companies, or where final customers were unidentified.  To ensure

that the universe of sales represents the universe of subsidies, Commerce must adjust the subsidy

rate to properly reflect the subsidy bestowed.  Where there is a mark-up by the affiliated trading

company on the entered value, an adjustment to the sales value would result in the imposition of

duties equal to the subsidies bestowed.

      Moreover, in <u>Ball Bearings from Thailand</u>, Commerce granted an EVA to a respondent

that exported to U.S. and non-U.S. markets.  57 Fed. Reg. at 26,647.  In fact, Commerce rejected

the petitioner's argument that the accuracy of the adjustment was dependent on "the accuracy of

the allocation of subsidies to U.S. exports as opposed to all exports."  <u>Id.</u>  The petitioners

claimed that the producers did not show "that the mark-up on shipments to other countries is

equal to the mark-up on shipments to the United States" and that "the allocation of subsidies to

exports to different countries may be skewed" because "transfer prices may vary by country of

destination."  <u>Id.</u>  Commerce concluded, however, that because the adjustment was "based on the

existence of the one-to-one invoice tracking system for U.S. shipments, it is not necessary for

[Commerce] to allocate subsidies by country."  <u>Id</u>

      Accordingly, Commerce does not adequately explain how the six criteria are all relevant

to the facts of this case and how those that are relevant are not satisfied.  Moreover, Commerce

does not explain why the adjustment of the sales value in the subsidy calculation must be limited

to sales that ultimately reach U.S. customers when the subsidy benefits are allocated over all

sales.  Thus, if Commerce's failure to grant an EVA was based on Zhongji's failure to

specifically identify U.S. sales or U.S. customers or because of the existence of sales to non-U.S.

customers, it is not supported by the relied upon evidence of record and clear reasoning.  If it is

actually based on something else, Commerce should explain it clearly.  The matter is remanded

for further consideration consistent with this opinion.  On remand, Commerce must explain what

information uncovered at verification caused it to find the EVA request unsupported.  It may be

that Commerce had reason to believe there was an alteration that made its way into entered value

that negated all or some of the Hong Kong mark-up.  If that is what is meant by a failure to meet

the direct shipment to the United States criterion, Commerce should explain that and cite the

relevant evidence of record.

**II.    Export Buyer's Credit Program**

The Export Buyer's Credit Program ("EBCP") of the Export-Import Bank of China ("Ex-

Im Bank") is used to promote exports by providing credit at preferential rates to foreign

purchasers of goods exported by Chinese companies.  See Clearon Corp v. United States, 359 F.

Supp. 3d 1344, 1347 (CIT 2019).

In response to Commerce's initial and supplemental questionnaires regarding the possible

use of the EBCP, Zhongji submitted affiliate and customer certifications of non-use applicable to

the POI stating that U.S.-based customers had not benefitted from the EBCP, which the GOC

confirmed to be accurate.  Prelim I&D Memo at 27–28; Zhongji Initial Questionnaire Response

at Vol I, Ex. 12; GOC Initial Questionnaire Response at 13, P.R. 132, 146, 151, 152, 158 (June

12, 2017).  The GOC, however, refused to provide the 2013 Implementing Rules of the Ex-Im

Bank and information regarding potential third-party bank involvement in the EBCP, stating that

this information was not public and irrelevant to Commerce's determination regarding whether

respondent's customers used the program.  See I&D Memo at 24, 29. The GOC further claimed

that all necessary information relevant to confirming non-use was provided.  See id. at 23–24,

29–31.  Commerce, however, claimed that the withheld information necessary for Commerce to

Case 1:18-cv-00089-JAR   Document 42   Filed 09/18/19   Page 16 of 42

en

Court No. 18-00089                                                                                          Page 16

fully understand the operations of the program.  Id. at 29.  Specifically, the information would

identify whether the Ex-Im Bank uses third-party banks to disburse credits, provide information

on the size of contracts to which credits are applicable, and help Commerce "understand how

export buyer's credits flow to and from foreign buyers and China Ex-Im."  Id.  Therefore,

Commerce concluded, the information was necessary to verify non-use of the program.  Id. at

29–30.  Commerce further explained that the certifications were unverifiable without the

information requested of the GOC because its understanding of the program was incomplete and

unreliable and reasoned that verifying the certificates was impossible without information

regarding the EBCP's operation and involvement with third-party banks.  Id. at 31–32.

Moreover, Commerce claimed, it could not otherwise verify non-use because the primary entity

that possesses such supporting information is the Ex-Im Bank.  Id. at 31.  Absent this

information, Commerce concluded, "the [GOC]'s claims that the respondent companies did not

use the program are not reliable."  Id. at 29–30. Accordingly, Commerce concluded that the

GOC "withheld necessary information that was requested and significantly impeded the

proceeding" and failed to cooperate by "not acting to the best of its ability."  Id. at 31.  Despite

respondent's full cooperation and provision of non-use certifications, Commerce applied adverse

inferences to facts otherwise available ("AFA") and concluded that respondents benefited from

the EBCP.  Id. at 29.

        Zhongji argues that Commerce unlawfully used AFA in determining that respondents

benefited from the EBCP.  Zhongji Br. at 18.  Specifically, Zhongji claims that Commerce's

imposition was not supported by record evidence because Commerce ignored uncontradicted

non-use evidence and conflated its desire to know the operation of the EBCP with its need to

know whether the program was used.  Zhongji Br. at 19–20, 23–26.  Zhongji contends that there

was no missing information on the record to warrant Commerce's use of AFA and that

Commerce had "no reasonable basis to make the threshold finding of non-cooperation" when the

GOC provided Commerce with "all the information necessary for understanding the program."

Zhongji Br. at 20–21.  Additionally, Zhongji argues that even if Commerce's use of AFA was

reasonable, Commerce did not reasonably apply the benchmark rate for use of the EBCP.

Zhongji Br. at 27–30.  The government contends that Commerce's use of AFA in determining

that respondents benefitted from the EBCP and Commerce's selection of the AFA rate for the

EBCP was in accordance with law and supported by substantial evidence.  Gov't Br. at 22–23,

29–30.

      When Commerce is unable to render a decision because "necessary information is not

available on the record" or an interested party has withheld requested information, significantly

impeded the investigation, or provided unverifiable information, Commerce may "use the facts

otherwise available" to reach a decision.  19 U.S.C. § 1677e(a).  Commerce may apply adverse

inferences to the facts otherwise available when it finds "that an interested party has failed to

cooperate by not acting to the best of its ability."  19 U.S.C. § 1677e(b).  An interested party has

failed to cooperate "to the best of its ability" when it has not "put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon

Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  If a foreign government fails

to cooperate under 19 U.S.C. § 1677e(b), Commerce may apply AFA to an otherwise

cooperating party but should "seek to avoid such impact if relevant information exists elsewhere

on the record."  Archer Daniels Midland Co. v. United States, 917 F. Supp. 2d 1331, 1342 (CIT

2013).

The court has recently issued several opinions that address the use of adverse inferences to determine that a cooperating party has benefited from the EBCP due to GOC's withholding of requested information.  Most have held that Commerce fails to provide a reasonable explanation as to its need for the withheld information to verify non-use when it merely states that a reliable understanding of EBCP's operation is a prerequisite to verifying non-use.  See Clearon Corp. v. United States, 359 F. Supp. 3d 1344, 1360, 1363 (CIT 2019) (remanding Commerce's use of AFA and holding that Commerce needs to give an "adequate answer as to why the information it seeks . . . is necessary to fill a gap . . . or rely on the information it has on the record."); Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316, 1327 (CIT 2018) ("Changzhou II") (remanding Commerce's use of AFA and holding that in order to apply AFA Commerce must explain "if and how certifications of non-use are unverifiable in the absence of the GOC's cooperation."); Guizhou Tyre Co. v. United States Slip Op. 19-114, 2019 WL 3948913, at *3 (CIT Aug. 21, 2019) ("Guizhou II") (collecting cases).  But see Changzhou Trina Solar Energy Co. v. United States, 195 F. Supp. 3d 1334, 1355 (CIT 2016) ("Changzhou I") (upholding Commerce's use of AFA when Commerce explained that it had no way of identifying use within the program without knowing how the exporter and its customers were involved in the distribution of credits, but where customer certifications of non-use were not submitted).  In Guizhou II, the court faulted Commerce for failing to correct blatant deficiencies in its AFA analysis.  2019 WL 3948913, at *3.  The court concluded that Commerce failed to demonstrate why information about the EBCP and the 2013 rule change is relevant to verifying the claims of non-use and why verification of those claims was impossible due to the rule change.  Id. at *4.

Accordingly, to apply an adverse inference that a cooperating party benefited from the EBCP based on the GOC's failure to cooperate, Commerce must: (1) define the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the GOC refused to give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify.  See Changzhou II, 352 F. Supp. 3d at 1326–27 (instructing Commerce to explain specifically why the information the GOC withheld created a gap that resulted in the use of AFA); Guizhou II, 2019 WL 3948913, at *5 (remanding for Commerce to explain why verification was impossible); see also Clearon Corp., 359 F. Supp. 3d at 1360.

Here, Commerce again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program.[9]  In this investigation, Commerce now specifies that record evidence indicates that third-party banks may be involved in the program as intermediaries between the Ex-Im Bank and U.S. customers.  But Commerce does not explain why an understanding of third-party bank involvement, if any, or any other aspect of the 2013 rule change, was necessary to verify claims of non-use.  In its brief to the court, for example, the government provides one such explanation: that the identities of third-party banks allegedly involved are unknown to Commerce, and those names, not "China-Ex-Im Bank,"

---

[9] Commerce acted under 19 U.S.C. § 1677e(a) and (b) because of the GOC's failure to answer. See I&D Memo at 31–32.  It did not expressly invoke 19 U.S.C. § 1677m(e)(2) here by rejecting respondents' information as unverifiable.

would appear in the records of U.S. customers that received EBCP credits.  Gov't Br. at 27–28.

Thus, if Commerce were to verify the ledgers of U.S. customers, it could check for credits from

those third-party banks.[10]  Commerce, however, did not provide even this bit of explanation in its

Final Determination, and it is thus a post hoc rationalization that cannot be the basis to find

Commerce's use of AFA supported by substantial evidence.  See SEC v. Chenery Corp., 318

U.S. 80, 95 (1943); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971).

But that argument still fails to explain how the 2013 rule change "affected the way [Commerce]

conducts verification" of non-use claims.  See Guizhou II, 2019 WL 3948913, at *4.  Critically,

Commerce does not explain why it could not identify the intermediate banks and the

corresponding bank disbursement information by soliciting information from respondents.  See

id. at *4 (stating that "surely [information regarding and access to intermediate banks] is not the

only way Commerce can verify the submitted non-use declarations").  Instead, Commerce

summarily declares that, as the "primary entity" involved, the Ex-Im Bank is the only entity that

possesses records sufficient to verify claims of non-use.

The EBCP has resulted in much litigation of late, and the parties appear to have retreated

to their respective corners.  Contestant number 1, the Department of Commerce, asserts that

because the GOC will not answer all of its questions about the program, a specific financial

---

[10] It is worth nothing that the government provided some doubt as to whether this information
would be helpful.  The government stated that "[e]ven if Commerce were to attempt to verify the
respondent's non-use of the program notwithstanding its lack of knowledge of which banks are
intermediary/correspondent banks by examining each loan received by each of the respondent's
U.S. customers, Commerce would still not be able to verify which loans were normal loans
versus program loans due to its lack of understanding concerning China Ex-Im Bank
involvement."  Gov't Br. at 28.

contribution from a governmental authority conferring a benefit on respondents and their

customers has resulted, i.e., a subsidy exists for which duties may be imposed to countervail it.

See 19 U.S.C. § 1677(5). Contestant number 2, the respondents, asserts that certificates of non-

use of the program by their customers is all that Commerce needs to conclude that no subsidy

was bestowed.  The referee, for her part, is not ready to declare the victor.

Neither of their assertions has been demonstrated to satisfy statutory investigative

requirements.  Rather than resting on the failure of the GOC and causing cooperating

respondents to bear the brunt of the adverse action, Commerce must consider what information

could be verified that would show non-use.  The private parties and Commerce are in the best

position to figure out what could answer the question as the private parties understand their own

operations, and Commerce, for its part, can determine how much certainty is required.[11]  As the

court has stated, effort should be made to avoid the collateral consequences to cooperating

parties of another's non-cooperation.  See Archer Daniels, 917 F. Supp. 2d at 1342.

If Commerce does not make further efforts to investigate, it is unlikely that the court will

be able to find that the statutory requirements for imposing countervailing duties have been met.

If the respondents are unwilling to provide more than certificates of non-use, where other steps

may reasonably be taken, they are unlikely to be viewed as cooperating.  In one case, the

domestic industry may suffer underserved consequences because countervailable subsidies may

have occurred but insufficient investigative behavior prevented them from being imposed.  On

---

[11] The court sees one possibility.  The court assumes the credits come through some Chinese
financial institution, even if not the Ex-Im Bank.  If a customer certifies that no loans from
Chinese entities were received, corporate records would reflect that.  This is only a suggestion to
spur thinking.

the other hand, if respondents do not make greater efforts, countervailing duties perhaps may be

imposed when no subsidy was received.  Either situation would be unfortunate.

There is no indication that this program will end, so an acceptable solution that will avoid

continued remands would be in everyone's interest.  Thus, the parties are directed to contemplate

a solution to the impasse and to confer.  This issue is remanded.

### III.    Electricity at Less Than Adequate Remuneration and Benchmark Selection

A subsidy is countervailable where "a government of a country or any public entity

within the territory of the country" provides "a financial contribution . . . to a person and a

benefit is thereby conferred."  19 U.S.C. § 1677(5)(B).  A "financial contribution" may be

provided in the form of "goods or services, other than general infrastructure."  19 U.S.C. §

1677(5)(D)(iii).  Where goods and services are provided, a benefit is conferred when "such

goods or services are provided for less than adequate remuneration," where the adequacy of the

remuneration is "determined in relation to the prevailing market conditions for the good or

service being provided . . . in the country which is subject to the investigation or review.

Prevailing market conditions include price, quality, availability, marketability, transportation,

and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E)(iv).  The subsidy must also be

"specific" in one of several enumerated ways.  See 19 U.S.C. § 1677(5A).

To determine whether a benefit is conferred through the provision of a good or service,

Commerce generally compares a calculated benchmark price with the respondent's reported

government price for the good or service provided.  See 19 C.F.R. § 351.511; Countervailing

Duties, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998).  Determining the

adequacy of the remuneration in this manner is problematic when the government is the sole

supplier of a good or service, because "'there may be no alternative market prices available' to

use as a benchmark against which to measure the supplier's price." Maverick Tube Corporation

v. United States, 273 F. Supp. 3d 1293, 1298 (CIT 2017) (citations omitted).  Where the

government is the only source of the good available to consumers, as is the case here, Commerce

determines the adequacy of remuneration by "assessing whether the government price is

consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii) (referred to as the "tier three"

benchmark analysis).[12]  Commerce assesses consistency with market principles using "such

factors as the government's price-setting philosophy, costs (including rates of return sufficient to

ensure future operations), or possible price discrimination." Countervailing Duties, 63 Fed. Reg.

at 65,377–78 (stating that these factors are not hierarchical, and that Commerce can rely on one

or more of them).  Commerce's experience suggests that "these types of analyses may be

necessary for such goods or services as electricity, land leases, or water." Id.  Following its

practice with respect to government-provided goods such as electricity, Commerce "first

examines how the government-owned utility company sets its rates and then determines whether

a respondent receives a price that is better than that afforded other companies or industries

purchasing comparable amounts of electricity." Maverick Tube, 273 F. Supp. 3d at 1300 (citing

Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium

from Canada, C-122-815, 57 Fed. Reg. 30,946, 30,950 (Dep't Commerce July 13, 1992) ("If the

---

[12] Commerce developed a three-tiered hierarchical approach to determine whether a benefit was conferred.  See 19 C.F.R. § 351.511(a)(2)(i)–(iii).  Under tier one, Commerce compares the government price to a market-determined price for the good or service resulting from actual transactions in the country in question.  19 C.F.R. § 351.511(a)(2)(i).  Under tier two, which applies where a market-determined price is unavailable, Commerce compares the government price to a world market price.  19 C.F.R. § 351.511(a)(2)(ii).

rate charged is consistent with the standard pricing mechanism and the company under

investigation is, in all other respects, essentially treated no differently than other industries which

purchase comparable amounts of electricity, [Commerce] would probably not find a

countervailable subsidy.")).

During the investigation, Commerce first requested that the GOC provide information

regarding the roles and nature of the cooperation between Chinese provinces and the National

Development and Reform Commission ("NDRC"). Prelim I&D Memo at 37. Commerce

requested information about the NDRC's role in deriving electricity price adjustments, including

"Provincial Price Proposals" for each province in which mandatory respondents were located, to

enable Commerce to determine whether the provision of electricity was a countervailable

subsidy. Id. at 37. Specifically, Commerce sought "to determine the process by which

electricity prices and price adjustments are derived, identify entities that manage and impact

price adjustment processes, and examine cost elements included in the derivation of electricity

prices in effect throughout the PRC during the POI." Id. at 38. In its responses, the GOC

claimed that the NDRC "no longer reviews, i.e. approves, electricity pricing schedules submitted

to it by the provinces." Id. (citing GOC Initial Questionnaire Response at Exhibit E4-1 ("Notice

748")). In essence, the GOC claimed that the NDRC no longer had an impact on electricity

prices, that prices were set autonomously by the provinces, and that those prices and any

adjustments were based on market principles. Id. Commerce, however, concluded that Notice

748 and Notice 3105, price adjustment notices developed by the NDRC and the National Energy

Administration, "explicitly direct provinces to reduce prices and to report the enactment of those

changes to the NDRC." Id. at 39. In addition, Commerce also requested information regarding

the derivation of the price at the provincial level, the pricing values indicated in the Appendix to

Notice 748, and the price reduction amounts indicated in Notices 748 and 3105.  Id. at 39–40.

Commerce was unsatisfied with the GOC's responses, which restated the claims that the Notices

merely delegate pricing authority to the provinces and that price adjustments are based on supply

and demand.  Id. at 40–41.

Commerce made three final determinations related to the GOC's provision of electricity

to respondents.  Commerce first concluded that the provision of electricity was a financial

contribution of a good, and not of general infrastructure, relying on this court's decision in Royal

Thai Gov't v. United States, 441 F. Supp. 2d 1350 (CIT 2006).  I&D Memo at 65.  Second, in

the light of the GOC's withholding of information[13] and failure to comply to the best of its

ability, Commerce applied an adverse inference to determine that the provision of electricity

constituted a financial contribution that was specific.  I&D Memo at 62–63; Prelim I&D Memo

at 37–41.  Third, in selecting the benchmark for determining the existence and amount of the

benefit, Commerce also applied an adverse inference to select the highest non-seasonal

provincial electricity rates on the record for various industry categories used by respondent.  I&D

---

[13] Commerce summarized the information withheld from it by the GOC:

> Provincial Price Proposals; the specific derivation of increases in cost elements
> and the methodology used to calculated cost element increases; legislation that
> may have eliminated the Price Proposals; explanation, with supporting
> documents, how pricing values in the Appendix to Notice 748 were derived;
> information concerning the coincidence of provincial price changes with Notices
> 748 and 3105; and explanation of the factors and information that Jiangsu and
> Guangdong Province relied upon to generate their submitted price adjustments
> and tariffs.

I&D Memo at 63.

Memo at 60; Prelim I&D Memo at 52–53 (listing the categories as "large industry," "general

industry and commerce," and "base charge").

Zhongji first challenges Commerce's reliance on Royal Thai and its finding that the

provision of electricity is not "general infrastructure." Zhongji Br. at 30; Reply Br. at 20–21.

Zhongji claims that, because the electricity service is available to the public, i.e., "developed for

the benefit of society as a whole," and openly traded on the market, Commerce was precluded

from finding a financial contribution. Zhongji Br. at 31; Reply Br. at 21 (quoting Countervailing

Duties, 63 Fed. Reg. at 65,378). But Zhongji misunderstands the nature of the financial

contribution at issue here. The regulations provide that "general infrastructure" is "infrastructure

created for the broad societal welfare of a country, region, state or municipality." 19 C.F.R. §

351.511(d). In Royal Thai, the court specified that the provision of electricity was not

considered general infrastructure because the use of a kilowatt of electricity by a single consumer

is not shared by the entire public. 441 F. Supp. 2d at 1356–57. By contrast, the court reasoned,

the provision of electric power facilities or distribution grids, which are "used repeatedly by the

entire consuming public," is general infrastructure under the statute. Id. at 1356 (distinguishing

Bethlehem Steel Corp. v. United States, 223 F. Supp. 2d 1372 (CIT 2002)). Here, as in Royal

Thai, although the electricity service may be available to the public, the subsidy at issue is the

electricity provided by the GOC at LTAR to respondents. Accordingly, Commerce properly

concluded that the provision of electricity at LTAR, the subsidy at issue, was not general

infrastructure.

Zhongji then challenges Commerce's determination, through the use of AFA, that the

electricity program is specific. Zhongji Br. at 31–32. Zhongji claims that Commerce failed to

make a specificity determination and establish the relationship between the GOC's withholding

of information and a finding of specificity.  Id.; Reply Br. at 20.  The government, for its part,

supports Commerce's use of AFA to find specificity generally and claims that such a use was

proper here because the GOC failed "to explain the relationship between provincial tariff

schedules and cost, as well as the nature of the cooperation in price setting practices between the

[NDRC] and provinces in electricity price adjustments."  Gov. Br. at 33–34.  Defendant-

Intervenors claim that "GOC's failure to provide information on the relationship between

government-established electricity prices and the relevant power generation costs – both within

and among the Chinese provinces – hindered Commerce's ability to assess the program's

specificity."  See Def.-Ints. Br. at 34.  They claim that without "source documents demonstrating

that high-cost end users of electricity paid a higher price than low-cost end users," Commerce

could not verify that price differentials between these consumers were founded on market

principles and not policy goals.  Id. at 34–35.

     Under the statute, a domestic subsidy is specific as a "matter of fact" if "[t]he actual

recipients of the subsidy . . .  are limited in number," if "[a]n enterprise or industry is a

predominant user of the subsidy," if "[a]n enterprise or industry receives a disproportionately

large amount of the subsidy," or if "[t]he manner in which the authority providing the subsidy

has exercised discretion in the decision to grant the subsidy indicates that an enterprise or

industry is favored over others," or it may be specific where it "is limited to an enterprise or

industry located within a designated geographical region."  19 U.S.C. § 1677(5A)(D)(iii), (iv).

In Changzhou II, the court stated that Commerce could not apply AFA simply because of GOC's

failure to cooperate but must "actually engage in an analysis of the information on the record and

explain how adverse inferences lead to the conclusion that the provision of electricity in [the

PRC] is a countervailable subsidy." 352 F. Supp. 3d at 1342.  In Changzhou II, unlike here, the

GOC refused to answer any questions related to regional electrical differences, including

differences between industries, and did not place the notices related to the NDRC on the record.

Id.  On this basis alone, Commerce applied AFA and concluded that the subsidy was specific

because it could not determine whether electricity prices were set in accordance with market

principles.  Id.  Here, similarly, Commerce stated that the GOC withheld requested information

for its analysis of specificity and applied AFA without determining exactly how the subsidy was

specific.[14]  See Prelim I&D Memo at 41; I&D Memo at 63.  Yet, unlike in Changzhou II, the

record strongly suggests that the GOC's failure to provide information regarding the provinces'

control over electricity pricing inhibited Commerce from determining specificity.

    For example, Notice 748, cited by Commerce, stipulates a lowering of on-grid electricity

sales prices in varying amounts for industrial and commercial use.  Prelim I&D Memo at 37–41.

In addition, it directs the reduction of that sales price, indicates that provincial authorities shall

make plans reflecting that price reduction and submit it to the NDRC, and ensures that

departments guarantee the implementation of the price adjustment.  Id. at 38–39.  Notice 3105

similarly directs the provinces to implement additional electricity price reductions.  Id. at 39.

These notices undermine the GOC's claim that the NDRC no longer controls electricity prices

---

[14] Commerce did not state how GOC's withholding of information led to the finding that, for
example, the recipients are limited in number, that the aluminum industry is the predominant
user or receives a disproportionately large amount of the subsidy, or that discretion over the
subsidy suggests the GOC favors the aluminum industry.  See 19 U.S.C. § 1677(5A)(D)(iii).
Although Zhongji suggests that Commerce found specificity because the subsidy is limited to a
region, the record does not fully support this finding.  See Zhongji Br. at 33

and led Commerce to ask the GOC supplemental questions.  But when Commerce sought more

information on the setting of electricity prices by the provinces, the GOC repeated its previous

statements and "failed to explain how final price increases were allocated across the respondents'

provinces and across tariff end-user categories."  Id.  More information regarding the setting of

the electricity prices by the provinces would reveal how the price reductions may have been

allocated to certain industries.  Pricing data stating which end-user categories received certain

price reductions or increases, for example, would reveal whether the aluminum industry took a

disproportionate share of the subsidy.  See RZBC Grp. Shareholding Co. v. United States, 100 F.

Supp. 3d 1288, 1298, 1301 (CIT 2015) (finding that information in response to Commerce's

request for more granular details about industries in the PRC that purchased calcium carbonate

might have revealed whether there was a disproportionate allocation of the GOC's subsidies).

Given that record evidence suggests that the GOC controls electricity pricing, the GOC's failure

to provide information regarding how electricity pricing is set prevented Commerce from

determining specificity.  Accordingly, Commerce's use of AFA to find specificity is supported

by substantial evidence.

     Zhongji also challenges Commerce's selection of the electricity benchmark.  Zhongji Br.

at 32–34.  Zhongji first claims that Commerce's selection led to a benchmark derived from

multiple regions in which no aluminum foil producer could logically be present at the same time.

Id. at 32–33.  The government responds that Commerce's selection of a benchmark under the

statute is based on market conditions in the country subject to the investigation, and not in

particular provinces, and that its application of AFA is supported by this court's previous

decisions.  Gov't Br. at 36.  Defendant-Intervenors argue that because the GOC failed to provide

information regarding "price differences between the provinces, how the provinces derive

electricity price adjustments, and how they cooperate with the NDRC," Commerce could not

assess whether the price was consistent with market principles under a tier three benchmark

analysis.  Def.-Ints. Br. at 37.  The court agrees.  As the court has previously stated, where

> [t]he GOC refuse[s] to provide certain details regarding variation of provincial
> electricity rates and whether these rates were calculated based on market
> principles. Accordingly, Commerce can apply an adverse inference to the GOC's
> electricity rate submissions and select the highest rates for each electrical category
> and use those to set a benchmark.

Changzhou II, 352 F. Supp. 3d at 1343 (stating that Commerce's "goal in setting a benchmark

rate is to best approximate the market rate of electricity, not to choose the rate respondents were

most likely to pay in an electricity market Commerce argues is tainted by the GOC's

interference") (citations omitted); see also Fine Furniture v. United States, 865 F. Supp. 2d 1254,

1260–1263 (CIT 2012) (upholding Commerce's decision to set the benchmark rate for electricity

equal to the highest rate reported in the provincial price schedules).  Commerce's decision to

select the highest rate was within its lawful discretion and Zhongji provides no argument for why

Commerce's selection of the highest rate from various provinces is less reflective of the market

rate for electricity absent government interference.  See Changzhou II, 352 F. Supp. 3d at 1343.

Accordingly, Commerce's calculation of the benchmark is consistent with its regulations and is

in accordance with law.

## IV.    Reliance on Maersk Data

In determining the proper ocean freight charge to be added for the benchmark

calculations, Commerce relied on actual price quotes sourced from Maersk for shipping cargo to

Shanghai, China.  I&D Memo at 65–66; see also Prelim I&D Memo at 17–18.  Commerce

rejected Zhongji's proffered Xeneta rates because its data inconsistently included or excluded

terminal handling charges in calculating freight rates to Asia.  I&D Memo at 65.

Zhongji argues that Commerce's decision is not supported by substantial evidence

because the Maersk data is flawed and the Xeneta rates is superior.  Zhongji Br. 34–37.  First,

Zhongji argues that the Maersk data is not contemporaneous with the POI and only includes the

first eight days of the months between January 2015 and August 2015.  Zhongji Br. 34–35.

Zhongji asserts that the Maersk data was affected by a "dockworker strike on the West Coast of

the United States," which did not impact rates in POI.  Zhongji Br. at 36.  Second, Zhongji

contends the data is not representative of the market rate for ocean freight because it consisted of

price quotes, not final payments, and thus subject to change.  Zhongji Br. 34.  Zhongji claims

Commerce should instead use the Xeneta data, or, if the court determines that the Maersk data is

reasonably reliable, average the data set from Maersk and Xeneta. Zhongji Br. 34, 37.  The

government claims that Zhongji is barred from arguing that the Maersk data set is non-

contemporaneous because it failed to raise the issue in its administrative case brief.  See Gov't

Br. at 38.  Moreover, the government and defendant-intervenors argue that Commerce properly

refrained from using the Xeneta data, relying on Maersk price quotes used in the Silica Fabric

investigation.  Gov't Br. at 39; Def-Int Br. at 38–42.

As a preliminary matter, the court considers whether Zhongji is barred from raising the

claim that the Maersk data is non-contemporaneous because it did not clearly raise before

Commerce.  Commerce's regulations further require that an interested party's case brief "present

all arguments that continue in the submitter's view to be relevant to [Commerce's] final

determination or final results."  19 C.F.R § 351.309(c)(2); see also Gerber Food (Yunnan) Co. v.

United States, 601 F. Supp. 2d 1370, 1379 (CIT 2009) (the "court usurps the agency's function

when it sets aside the administrative determination upon a ground not theretofore presented and

deprives [Commerce] of an opportunity to consider the matter, make its ruling, and state the

reasons for its action").  Zhongji contends that a contemporaneity argument was included, if not

implicit, in its case brief when it argued against using "Maersk rates from another investigation."

Reply Br. at 21–22.  Although Zhonji's case brief does not explicitly challenge the data on

contemporaneity grounds, the concerns underlying the exhaustion principle do not apply here.

Zhongji argued that the Maersk data was not the best available information in the light of the

Xeneta data.  Commerce had the opportunity to address why the Maersk data was the best

available information and why it excluded the Xeneta data.  Because Commerce generally looks

to contemporaneity to select the best available information, Zhongji's failure to expressly raise

that factor did not deprive Commerce the opportunity to address it.  See Import Admin., Dep't

Commerce, Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process

(Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited Sept. 12, 2019)

(listing contemporaneity as a factor Commerce uses to select the best available information).

Thus, Commerce was aware, or should have been aware, that it chose a non-contemporaneous

data set from a previous investigation in contravention of its policy.  See Issues and Decision

Memorandum for the Final Results of the Countervailing Duty Administrative Review of

Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, Form the

People's Republic of China; 2013 at Comment 7, POI 1/1/2013–12/31/2013, C-570-980 (Dep't

Commerce July 12, 2016) ("[Commerce] preference, where possible is to rely on

contemporaneous data over non-contemporaneous data" for the ocean freight benchmark). The

court will exercise its discretion under 28 U.S.C. § 2637(d) not to bar Zhongji's contemporaneity

argument on exhaustion grounds.

Regardless, Zhongji's argument that the contemporaneity problem with regard to the

Maersk data is determinative fails. "[N]on-contemporaneous freight rate data [can be] affected

by factors not present during the POR, for example, changes in demand for freight from year-to-

year, changing energy costs, or construction of new ports, or <u>inability to use particular ports</u>."

<u>Changzhou Trina Solar Energy Co. v. United States</u>, 255 F. Supp. 3d 1312, 1323 (CIT 2017)

(emphasis added). Zhongji, however, provides no evidence that the dockworker strike restricted

access to ports or significantly impacted shipping rates from Asian markets to the United States.

Zhongji's only evidence is the statement that the labor dispute lasted for nine months and

"snarled international trade at seaports handling about $1 trillion worth of cargo annually."

Zhongji Br. at 36; Mem. from John Corrigan to the File re: Placing Information on the Record at

Attach. 1, p. 3 (Aug. 2, 2017) (P.R. 276). Moreover, the record in the Silica Fabric investigation

suggests that Commerce excluded certain data points that may have been affected by the

dockworker's strike. Critically, this court has previously affirmed Commerce's use of Maersk

data points from a period prior to the POI. <u>See, e.g.,</u> <u>Issues and Decision Memorandum for the</u>

<u>Final Results of Expedited Review of the Countervailing Duty Order on Certain Carbon and</u>

<u>Alloy Steel Cut-to- Length Plate from the People's Republic of China</u> POI 1/1/2015–12/31/2015,

C-570-048 (Dep't Commerce July 13, 2018). Zhongji has failed to distinguish the Commerce's

use of Maersk data here from its previous reasonable use of that data.

Zhongji's contention that the Maersk data is flawed because it is based on price quotes is

also unavailing. In measuring adequate remuneration, Commerce is required to calculate "the

price that a firm actually paid <u>or would pay</u> if it imported" the product at issue.  19 C.F.R. §

351.511(a)(2)(iv) (emphasis added).  The court has consistently held that price quotes can

reasonably be used to calculate ocean freight benchmarks when they are sourced from a

reputable authority.  <u>See</u> <u>TMK IPSCO v. United States</u>, 222 F.Supp.3d 1306, 1320–21 (CIT

2017); <u>Changzhou II</u>, 352 F. Supp. 3d at 1339.  As the court stated in <u>Changzhou Trina</u>, "[g]iven

Maersk's prominent position in the shipping market, Commerce properly considered the Maersk

data to be a reliable world market price." <u>Id.</u>  Accordingly, Commerce's use of the Maersk data,

despite its lack of contemporaneity with the POI, is supported by substantial evidence.

        Commerce was also not required to average the Xeneta data with the Maersk data

because the Xeneta data did not meet the standards of consistency set forth by the regulations.

Although Commerce's regulations require that Commerce average commercially available world

market prices to the extent practicable, see 19 C.F.R. 351.511(a)(2)(ii), those prices must "reflect

the price that a firm actually paid or would pay if it imported the product."  19 C.F.R. §

351.511(a)(2)(iv).  The regulations require that Commerce "include delivery charges and import

duties" in the comparison price.  <u>Id.</u>  The Xeneta data, however, includes or excludes terminal

handling charges—a type of delivery charge incident to all shipments —in its freight rate data

depending on the origin and destination of each shipment.  <u>Zhongji Benchmark Submission</u> at

Ex. 2, P.R. 235 (July 21, 2017).  In other words, the shipment costs in the Xeneta data varies in

its inclusion of origin and destination terminal handling charges.  <u>Id.</u>  Commerce, therefore,

reasonably concluded that the Xeneta data failed to consistently include delivery charges, and

that Commerce could not rely on the data in calculating adequate remuneration.[15]  Accordingly,

Commerce's decision to calculate an ocean freight benchmark based solely on the Maersk data is

supported by substantial evidence.

**V.    Countervailed "Other Subsidies"**

Generally, investigations into potentially countervailable subsidies are either self-initiated

by Commerce or a result of a petition by a domestic interested party on behalf of an industry.  19

U.S.C. § 1671a(a), (b).  If, during a proceeding, Commerce "discovers a practice which appears

to be a countervailable subsidy, but was not included in the matters alleged in a countervailing

duty petition," then Commerce includes "the practice, subsidy, or subsidy program in the

proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy

with respect to the merchandise which is the subject of the proceeding." 19 U.S.C. § 1677d; see

also 19 C.F.R. § 351.311.  The regulations specify that Commerce will examine such a practice

if it "concludes that sufficient time remains" before the final determination.  19 C.F.R. §

351.311(b).  The regulations also permit the deferral of the examination of a program that

appears to be countervailable if insufficient time remains.  19 C.F.R. § 351.311(c).  In Allegheny

Ludlum Corp. v. United States, this court examined the level of inquiry required to determine

whether a subsidy "appears" to be countervailable, given the statute and regulation's silence on

the issue.  See 25 CIT 816, 822–24 (2001).  The court concluded that, although the statute

"offers a petitioner the opportunity to call Commerce's attention to a potentially countervailable

---

[15] In addition, pricing data must be "publicly available."  19 C.F.R. § 351.102(b)(21)(iii).
Zhongji "request[ed] business proprietary treatment of the Xeneta freight rates in order to accord
appropriate protection to the intellectual property of Xeneta because the freight rates are for-
purchase."  Zhongji Benchmark Submission at 2.  This indicates that the Xeneta data is not
"publicly available" as required by the regulation, supporting its unsuitability.

subsidy, . . . it does not force Commerce to fully investigate any subsidy." Id. at 824. Moreover,

the court held, Commerce must review the record, "weigh[ing] and analyz[ing] both negative

evidence and positive evidence," to "determine whether the business practice appears to be a

countervailable subsidy." Id. (quotations omitted).

      In its initial questionnaire response, Zhongji reported receiving various "other subsidies"

from the GOC during the POI. Prelim I&D Memo at 41 (citing Zhongji Initial Questionnaire

Response at Vol. I p. 31, Vol. II p. 26, Vol. III p. 21). In its initial questionnaire to the GOC,

Commerce asked it "if it provided any other forms of assistance to subject producers," and "to

coordinate with the Respondents on any additional subsidies reported by the companies in order

to provide detailed information." I&D Memo at 22. The GOC responded by stating that

Commerce's request was "premature absent a more direct inquiry supported by credible evidence

and the initiation of a discrete investigation." I&D Memo at 23; see also Prelim I&D Memo at

42. In supplemental questionnaires regarding these "other subsidies," the GOC submitted

previously reported information and "withheld all additional information required by Commerce

to determine the countervailability of the reported grants." I&D Memo at 23. Because necessary

information to determine specificity was not available on the record, and because the GOC

withheld information and failed to cooperate to the best of its ability, Commerce applied AFA to

find the "other subsidies" countervailable. Prelim I&D Memo at 42; I&D Memo at 23. In its

Final Determination, in response to arguments that it could not initiate an investigation into these

subsidies, Commerce concluded that its decision to investigate "other subsidies" reported by the

respondents "fell squarely within the guidelines established under [19 U.S.C. §1677d] and 19

C.F.R. § 351.311(b)." I&D Memo at 23.

Zhongji argues that Commerce unlawfully investigated "other subsidy" programs because it failed to identify any evidence that the subsidies appeared to be specific and countervailable before initiating an investigation into the programs, in violation of 19 U.S.C. § 1677d.  Zhongji Br. at 38–39.  Zhongji claims that Commerce cannot initiate an investigation into a program without an analysis, based on credible evidence, as to whether the program "appears to be countervailable."  Id.  Accordingly, Zhongji contends, Commerce's reliance on AFA for the GOC's refusal to provide information related to "other subsidies" rendered Commerce's determination contrary to law.  Id.

Zhongji's argument is misguided.  First, the elements of a countervailable subsidy need not be identified before examining non-alleged subsidies.  Rather, given the nature of the subsidies self-reported by Zhongji, Commerce could reasonably find that it required supplementary documentation to determine whether these "other subsidies" were countervailable.  See Def.-Ints. Br. at 44 (citing Zhongji Initial Questionnaire Response at Vol. I at 31 & Ex. 22); I&D Memo at 22.  Second, as stated in Allegheny, Commerce must determine whether a program appears to be countervailable by looking at record evidence.  See 25 CIT at 824–25.  In order to make that determination, therefore, Commerce is permitted to request that information be placed on the record regarding any reported subsidies.  Zhongji's argument to the contrary would permit Commerce to examine unalleged subsidies only where record evidence tangentially demonstrates that a subsidy is actually countervailable.  This reading of the statute is too restrictive.  Rather, because Commerce is urged to ensure "proper aggregation of subsidization practices," see S. Rep. No. 96-249, at 98 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 484, and given its investigative authority under 19 U.S.C. §§ 1671a(a) and 1677d,

Commerce is permitted to request that documentation be placed on the record so that it may

determine whether subsidies discovered during the investigation are countervailable.  Here,

because the GOC withheld information as to the specificity of the subsidies and failed to

cooperate to the best of its ability, Commerce reasonably applied AFA.  Accordingly,

Commerce's decision to countervail "other subsidies" self-reported by Zhongji is supported by

substantial evidence.

**VI.    Policy Loans**

Commerce determined that loans reported by Zhongji from state owned commercial

banks ("SOCBs") provided countervailable subsidies under a lending program that encouraged

the development of the aluminum foil industry.  I&D Memo at 14–21; Prelim I&D Memo at 42–

44.  When analyzing a lending program supporting a policy initiative, Commerce examines

whether "government plans or other policy directives lay out objectives or goals for developing

the industry and call for lending to support objectives or goals."  I&D Memo at 14 (citing

Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing

Duty Determination, 76 Fed. Reg. 18,521 (Dep't Commerce Apr. 4, 2011)); Prelim I&D Memo

at 42–41 (citing CFS from the PRC at Comment 8).  Commerce found that extensive record

evidence indicated that the GOC sought to target the aluminum foil industry for development in

recent and current years.  Prelim I&D Memo at 43–44.  Specifically, the GOC's plans seek to

accelerate the transformation of aluminum industry development, develop aluminum processing

and enhance utilization levels, and improve the competitiveness of the industry.  I&D Memo at

14–15; Prelim I&D Memo at 43–44.  Commerce also found that the banking sector in the PRC

remained under state control, resulting in the allocation of credit in accordance with government

policies directed specifically at encouraged industries, including the aluminum industry.  I&D

Memo at 15–16; Prelim I&D Memo at 44.  Policy guidance, for example, identifies the

aluminum industry, with a priority for aluminum foil, as an "encouraged" industry that shall

receive "credit support in compliance with credit principles."  I&D Memo at 16; Prelim I&D

Memo at 43.  Thus, Commerce concluded, the GOC provides target support to the aluminum foil

industry through preferential loans, such that the subsidy is specific under 19 U.S.C. § 1677(5A).

I&D Memo at 16; Prelim I&D Memo at 44.  Relying on its analysis in CFS from the PRC,

Commerce further concluded that SOCBs under the program constitute a "financial contribution"

from an "authority" that transfer loans to producers of aluminum because SOCBs "act in

accordance with government policies and effectuate government interests in providing the

lending."  I&D Memo at 18–19.  Accordingly, Commerce calculated a benefit conferred to

Zhongji equal to the difference between the amount Zhongji paid on the loans and the amount

Zhongji would have paid on a comparable commercial loan.  Prelim I&D Memo at 44.  To

calculate the benefit from this program, Commerce used benchmarks for countries similar to the

PRC in gross national income based on the World Bank classification.  Prelim I&D Memo at 14,

44.  Commerce then used the lending and inflation rates by those similar countries reported to

the International Monetary Fund for the benchmark interest rate.  Id. at 14.

     Zhongji first argues that substantial evidence does not support a finding that a "financial

contribution" was provided by an "authority."  Zhongji Br. at 40–42.  Zhongji claims that

Commerce misconstrued broad industrial policies as financial support to the aluminum foil

industry, where the policies instead sought to curb blind expansion of the industry.  Id. at 41;

Reply at 25–26.  Moreover, Zhongji then contends that evidence on the record showing a

diversified and competitive banking sector in the PRC, including market-oriented reforms

liberalizing loan management, such that the banking sector is not an authority as defined under

section 1677(5)(B).  Zhongji Br. at 40.  Zhongji further argues without citation to specific record

evidence that a benefit was not conferred because the bank loans were not provided at below

commercial interest rates, because they "fluctuated in line with macroeconomic conditions

during the POI," including those in the United States.  Id. at 41–42; Reply Br. at 25.  The

government argues that Commerce's conclusion that SOCBs are "authorities" under section

1677(5) because they "pursue and effectuate government policies" is consistent with its prior

policies and assessment of the lending system in the PRC.  Gov't Br. at 44.  The government and

Defendant-Intervenors claim that substantial evidence supports Commerce's findings that the

subsidies were specific and conferred a benefit on Zhongji.  Gov't Br. at 45–46; Def.-Ints. Br. at

47–50.

      Here, Commerce properly determined that SOCBs act as "authorities" that provide a

"financial contribution" in the form of loans.  See 19 U.S.C. § 1677(5). As in CFS from the PRC,

Commerce determined that "the record indicates that the [PRC] banking system remains under

State control and continues to suffer from the legacies associated with the longstanding pursuit of

government policy objectives.  These factors undermine the SOCBs ability to act on a

commercial basis and allow for continued government control resulting in the allocation of credit

in accordance with government policies"  I&D Memo at 18.  Commerce based the determination

that SOCBs in the PRC cannot be treated as commercial banks on a 2017 evaluation of the

financial system in the PRC.  See I&D Memo at 18–19; Review of China's Financial System

Memorandum at 7,  P.R. 270-275 (Dep't Commerce Aug. 1, 2017) ("Financial System

Memorandum") (stating that the GOC uses "the banking sector as a key policy instrument to

allocate capital to priority industries."). Moreover, record evidence substantially supports the

finding that these loans were specific to the aluminum industry, including producers of

aluminum foil, because several PRC development plans specifically identify aluminum foil for

priority development among more general policy goals of improving the development of the

aluminum sector. I&D Memo at 14, 15 (citing GOC Initial Questionnaire Response at 9, Exs.

A1-17, A1-19, A1-20, & A1-21). In addition, the PRC's current five-year economic and social

development plan explicitly encourages the development of the aluminum industry and states

that these policy goals should be achieved with financial support from industrial authorities "at

all levels." See I&D Memo at 15. Thus, Commerce's finding that the SOCB loans were a

"financial contribution" from an "authority" is supported by substantial evidence.

        Finally, contrary to Zhongji's argument, Commerce did find on the record that the policy

loans were given at preferential rates and thus conferred a benefit to Zhongji. A benefit is

conferred, "in the case of a loan, if there is a difference between the amount the recipient of the

loan pays on the loan and the amount the recipient would pay on a comparable commercial loan

that the recipient could actually obtain on the market." 19 U.S.C. § 1677(E)(ii). After

concluding that the SOCBs loans constituted a specific financial contribution by an authority,

Commerce stated that "[t]he loans provide a benefit equal to the difference between what the

recipients paid on their loans and the amount they would have paid on comparable commercial

loans." Prelim I&D Memo at 44. Commerce concluded that loans provided by PRC banks do

not reflect rates found in a functioning market and that, based on its Financial System

Memorandum, the GOC's role in the financial system distorts the lending practices enough to

preclude the use of interest rates in the PRC for CVD benchmarking.  Prelim I&D Memo at 12.

Commerce rejected the GOC's argument that the determinations in the Financial System

Memorandum are inaccurate and outdated.  I&D Memo at 20–21  Thus, in determining the

amount Zhongji would pay on a commercial loan that it could actually obtain on the market,

Commerce reasonably relied on market rates issued by commercial banks in similar countries, as

published by the IMF, to compare to the SOCBs rates.  Prelim I&D Memo at 13–14  Commerce

then calculated a benefit as a result of the difference between the effective interest rate charged

to Zhongji and the benchmark rate used.  See id.; Prelim. Calc. Memo at Attachment 2.

Accordingly, Commerce's use of market rates of similar countries provided by the IMF to

compare to Zhongji's SOCBs loans was in accordance with law and its determination that

Zhongji received a benefit from the policy loans supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the court remands Commerce's challenged determinations as

regards to its determination on the export value adjustment and the Export Buyer's Credit

Program.  All other determinations are sustained.  The court remands for proceedings consistent

with this opinion.  Remand results should be filed by November 18, 2019. Objections are due

December 18, 2019 and Responses to Objections are due January 17, 2020.


                                                   /s/ Jane A. Restani
                                                  Jane A. Restani, Judge


Dated: September 18, 2019
        New York, New York